FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 01 2010 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT  ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,

                          STATEMENT OF REASON FOR
      -against-                SENTENCE

ROBERTO VASQUEZ,               09-CR-259 (JG)

            Defendant.
-----------------------------------------------------------------x

JOHN GLEESON, United States District Judge:

      When people think about miscarriages of justice, they generally think big, especially in this era of DNA exonerations, in which wholly innocent people have been released from jail in significant numbers after long periods in prison. As disturbing as those cases are, the truth is that most of the time miscarriages of justice occur in small doses, in cases involving guilty defendants. This makes them easier to overlook. But when they are multiplied by the thousands of cases in which they occur, they have a greater impact on our criminal justice system than the cases you read about in the newspapers or hear about on *60 Minutes*. This case is a good example.

      Roberto Vasquez was born 36 years ago in Puerto Rico, the youngest of 12 children. He had no relationship with his father, who died when Vasquez was four or five years old. He did, however, have a relationship with one of his many older brothers that was especially damaging. From the age of seven, Vasquez was sexually abused repeatedly by this brother, and as a result he has struggled with depression his entire life.

      Vasquez dropped out of high school in the ninth grade. By his early twenties, he had acquired some expertise in fixing cars and trucks. He had also acquired a cocaine addiction. In approximately 1994, Vasquez commenced a turbulent ten-year relationship with Ingrid

Melendez, with whom he had three children. During that period, he suffered from multiple bouts of depression. When the relationship ended in 2004 due to Melendez's infidelity, Vasquez attempted suicide. He spent two months in Bellevue Hospital, where he received medications for depression and bi-polar disorder.

Other than the drug trafficking that got him convicted in this case, which is described below, Vasquez's entire criminal history stems from his relationship with Melendez. In December of 2004, after his release from Bellevue, she refused to let him see their children. He reacted by menacing her with a knife in front of the children. Though he was given a conditional discharge, he failed to abide by the conditions; six months later he violated an order of protection by threatening to kill Melendez. This conduct got Vasquez 60 days in jail on the earlier menacing case and 60 more for contemptuously violating the order of protection. A year later, in June of 2006, Vasquez once again showed up at Melendez's home without permission. He was convicted of harassment and given another conditional discharge.

In 2005, Vasquez met Maritza Caraballo, a bank teller. They lived together and enjoyed a stable relationship until March 25, 2009, when Vasquez was arrested in this case. They have a three-year-old daughter, and Carabello's eight-year-old daughter from a prior relationship also lives with them. Vasquez worked continuously during that period, first as an auto mechanic, then, beginning in 2007, as a construction supervisor. Vasquez and Caraballo are engaged to be married in June.

Melendez continued to deny Vasquez access to their three children. Caraballo reports that this produced an extremely stressful situation for Vasquez, who was complying with his court-ordered child support obligations to those children. Though Vasquez had stopped using drugs after he met and began living with Caraballo, under the mounting stress of his situation

with Melendez and their children, he finally relapsed in 2008, when he began using cocaine again. That development laid the groundwork for his involvement in his offense of conviction.

To support his expensive cocaine habit, Vasquez went to work in approximately September of 2008 for one of his older brothers, Jose Angel Vasquez, a drug dealer and his co-defendant in this case. Unfortunately for both of them, the government was intercepting the telephone calls of members of Jose Vasquez's business. Those calls identified the defendant as a minor participant in his brother's organization. More specifically, "[t]he government's investigation revealed that, for the most part, the defendant was a street-level distributor for his brother's organization, with only occasional and minor participation in the organization's broader activities." Letter from Assistant U.S. Attorney Bonnie Klapper to the Court, at 3 (Dec. 28, 2009). In the six to eight months he was involved in the business to support his habit, Vasquez personally assisted in the distribution of 300 grams of heroin. He was aware of the distribution of 350 additional grams by others, so he was responsible under the sentencing guidelines for 650 grams.

After his arrest, Vasquez tried to cooperate with the government. He provided information about two individuals, but it could not be corroborated. As the prosecutor stated when Vasquez first appeared for sentencing on December 29, if he "had more information, he would have received a" substantial assistance motion. Tr. December 29, 2009, at 11.

The government had it within its power to charge Vasquez with a standard drug trafficking charge, which carries a maximum sentence of 20 years. Instead, it included him in a conspiracy charge with his brother and three others and cited to a sentence-enhancing provision that carries a maximum of life in prison and a mandatory minimum of ten years upon conviction. During plea negotiations, the government refused to drop that charge unless Vasquez pled guilty

3

to a lesser-included sentencing enhancement that carried a maximum of 40 years and a mandatory minimum of five years.

A little background on these mandatory minimum sentences might be useful. In 1986, as part of the war on drugs and inflamed by the tragic death by overdose of a University of Maryland basketball star, Congress enacted the Anti-Drug Abuse Act of 1986, 21 U.S.C. § 801 et seq. The law mandated severe mandatory minimum sentences. As Senator Robert Byrd put it at the time, the goal was to require at least ten years in prison for "the kingpins – the masterminds who are really running these operations," and at least five years for the "middle-level dealers." 132 Cong. Rec. S14, 301 (daily ed. Sept. 30, 1986). Most people, including me, agree that the kingpins, masterminds, and mid-level managers of drug trafficking enterprises deserve severe punishment. But right from the start Congress made a mistake: it made a drug defendant's eligibility for the mandatory sentences depend not on his or her role in the offense, but on the quantity of drugs involved in the crime. Thus, if the crime involved one kilogram of heroin, five kilograms of cocaine, or only 50 grams of crack, every defendant involved in that crime, irrespective of his or her actual role, is treated as a kingpin or mastermind and must get at least ten years in jail. 21 U.S.C. § 841(b)(1)(A). The defendants are treated as mid-level managers (again, despite their actual conduct) if the offense involved as little as one-tenth of those amounts. 21 U.S.C. § 841(b)(1)(B).

The 1986 law was passed just as the recently-created United States Sentencing Commission was writing the federal sentencing guidelines, which would set forth sentencing ranges for all federal crimes. The Commission examined more than 10,000 drug sentences from around the country and considered formulating guidelines based on national averages. But it realized that it would not make sense to provide a guidelines range of, say, five to seven years

when a mandatory sentencing law would trump the guidelines sentence and require at least a ten-year sentence. So the Commission fashioned sentencing ranges for all drug offenses -- whether or not a mandatory minimum sentence was applicable -- that were proportional to the severe minimum sentences established by Congress. A later Commission -- in its 15-year report to Congress in 2004 -- criticized the original Commission's failure to discuss why it extended this "quantity-based" approach of the 1986 act across the entire spectrum of drug sentences, stating, "This is unfortunate for historians, because no other decision of the Commission has had such a profound impact on the federal prison population. The drug trafficking guideline . . . had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 49 (2004).

One result of this regime is that the sentencing ranges meted out by the guidelines are roughly proportionate to the mandatory minimum sentences. Thus, Vasquez's range is 57-71 months, which straddles his 60-month mandatory minimum. That range is too severe in this particular case, but the guidelines themselves permit departures from the applicable range. *See* U.S. Sentencing Guidelines Manual § 5K2.0. More importantly, in this post-*Booker* era of advisory guidelines, a defendant's sentencing range, useful though it is, is but one factor to be considered. *See United States v. Booker*, 543 U.S. 220, 259 (2005). If other considerations weigh in favor of a more lenient sentence, a more lenient sentence may be imposed. *See Gall v. United States*, 552 U.S. 38, 56-60 (2007).

The second result of this regime is placed in clear relief by this case. If they want to, prosecutors can decide that street-level defendants like Vasquez -- the low-hanging fruit for

law enforcement -- must receive the harsh sentences that Congress intended for kingpins and managers, no matter how many other factors weigh in favor of less severe sentences. The government concedes, as it must, that Vasquez played a *minor* role in his brother's modest drug operation, not the mid-level managerial role the five-year mandatory sentence was enacted to punish. Indeed, the government argues that Vasquez's guidelines computation includes a two-level *downward* adjustment because of his mitigating role in the offense. *See* U.S. Sentencing Guidelines Manual § 3B1.2(5). Yet, by the simple act of invoking the sentence-enhancing provision of the statute, the government has dictated the imposition of the severe sentence intended only for those with an aggravating role.

When the case was first called for sentencing in December, I pointed out the obvious: the five-year mandatory sentence in this case would be unjust. The prosecutor agreed, and welcomed my direction that she go back to the United States Attorney with a request from the Court that he withdraw the aspect of the charge that required the imposition of the five-year minimum. She asked for a couple of months to make the case that the sentence enhancement should be abandoned. Tr. December 29, 2009, at 15.

On March 5, 2010, the prosecutor appeared again, shadowed by a supervisor. She reported that the United States Attorney would not relent. She offered two reasons. The first was that I might have failed to focus on the fact that Vasquez had "received a bump down," meaning he was allowed to plead to the five-year mandatory minimum rather than to the ten-year mandatory minimum that he, his brother, and three other co-defendants were originally charged with. Tr. March 5, 2010, at 11. I think this means that Vasquez should be grateful the government did not insist on a ten-year minimum sentence based on additional quantities of cocaine it concedes he knew nothing about and could not be held responsible for under the

6

guidelines, presumably on the theory that other members of the same conspiracy dealt those quantities.[1] I suppose there is some consolation in the fact that the government did not pursue that absurd course, which would have produced an even more egregious injustice if Vasquez had been convicted. But that hardly explains, let alone justifies, the government's insistence on the injustice at hand.

Second, the prosecutor suggested that I had failed to "focus" on the seriousness of Vasquez's crimes against his ex-wife, Melendez. Tr. March 5, 2010, at 11. Implicit in that assertion is the contention that even if Vasquez does not deserve the five-year minimum because he was not a mid-level manager of a drug enterprise, he deserves it because of his past crimes. This rings especially hollow. Those past crimes have been front and center at all times, not only because they render Vasquez ineligible for safety valve relief from the minimum sentence, *see* 18 U.S.C. § 3553(f)(1), but also because there was litigation over how many criminal history points they warranted. When Vasquez first appeared for sentence on December 29, both of these subjects were discussed. Tr. December 29, 2009, at 3-6, 13-14. And when the prosecutor took the position that the criminal history points produced by Vasquez's past crimes *overstated* the gravity of those crimes, warranting a downward departure, it did not appear she had failed to focus on their seriousness either. *Id.* at 5, 13. In any event, I certainly had not.

I recognize that the United States Attorney is not required to explain to judges the reasons for decisions like this one, and for that reason I did not ask for them. But the ones that were volunteered do not withstand the slightest scrutiny.

---

[1] As the guidelines make clear, "[t]he principles and limits of sentencing accountability . . . are not always the same as the principles and limits of criminal liability." U.S. Sentencing Guidelines Manual § 1B1.3, application n.1.

As a result of the decision to insist on the five-year mandatory minimum, there was no judging going on at Vasquez's sentencing. Though in theory I could have considered a sentence of greater than 60 months, even the prosecutor recognized how ludicrous that would be, and asked for a 60-month sentence. But the prosecutor's refusal to permit consideration of a lesser sentence ended the matter, rendering irrelevant all the other factors that should have been considered to arrive at a just sentence. The defendant's difficult childhood and lifelong struggle with mental illness were out of bounds, as were the circumstances giving rise to his minor role in his brother's drug business (*i.e.*, it was to support an addiction, not to become a narcotics entrepreneur with a proprietary stake in the drugs), the fact that he tried to cooperate but was not involved enough in the drug trade to be of assistance, the effect of his incarceration on his three-year-old daughter and the eight-year-old child of Caraballo he is raising as his own, the fact that he has been a good father to them for nearly five years, the fact that his prior convictions all arose out of his ex-wife's refusal to permit him to see their three children. Sentencing is not a science, and I don't pretend to be better than anyone else at assimilating these and the numerous other factors, both aggravating and mitigating, that legitimately bear on an appropriate sentence. But I try my best to do just that, and by doing so to do justice for the individual before me and for our community. In this case, those efforts would have resulted in a prison term of 24 months, followed by a five-year period of supervision with conditions including both other forms of punishment (home detention and community service) and efforts to assist Vasquez with the mental health, substance abuse, and anger management problems that have plagued him, in some respects for his entire life. If he had failed to avail himself of those efforts, or if, for example, he intentionally had contact with Melendez without the prior authorization of his supervising probation officer, he would have gone back to jail on this case.

The mandatory minimum sentence in this case supplanted any effort to do justice, leaving in its place the heavy wooden club that was explicitly meant only for mid-level managers of drug operations. The absence of fit between the crude method of punishment and the particular set of circumstances before me was conspicuous; when I imposed sentence on the weak and sobbing Vasquez on March 5, everyone present, including the prosecutor, could feel the injustice.

In sum, though I am obligated by law to provide a statement of "reasons" for each sentence I impose, *see* 18 U.S.C. § 3553(c), in this case there was but one: I was forced by a law that should not have been invoked to impose a five-year prison term.

s/John Gleeson<br>John Gleeson, U.S.D.J.

Dated: March 30, 2010
      Brooklyn, New York